FILED IN MY OFFICE
DISTRICT COURT CLERK
1/28/2015 4:52:31 PM
STEPHEN T. PACHECO
Salvador Hernandez

FIRST JUDICIAL DISTRICT COURT
STATE OF NEW MEXICO
COUNTY OF SANTA FE

GRASSHOPPER NATURAL MEDICINE LLC, and
BRANDON TAYLOR, individually,

        Plaintiff,

v.

        No. _____ D-101-CV-2015-00318

THE HARTFORD CASUALTY
INSURANCE COMPANY,

        Defendant.

## COMPLAINT FOR DECLARATORY JUDGMENT, INSURANCE BAD FAITH AND RELATED CAUSES OF ACTION

COME NOW, Plaintiffs, Grasshopper Natural Medicine, LLC and Brandon Taylor, by and through their attorneys, H. Jesse Jacobus, III, Law Office of George "Dave" Giddens, P.C. and for their Complaint against Defendant states:

### PARTIES AND VENUE

1.    Plaintiff, Grasshopper Natural Medicine is a duly registered LLC, doing business in New Mexico and is currently a resident of Santa Fe County, State of New Mexico.

2.    Plaintiff Brandon Taylor is the owner of Grasshopper Natural Medicine, LLC ("Grasshopper").

3.    Plaintiff, individually, is also the owner of the building where Grasshopper, is located.



1

4.      The business relationship between Mr. Taylor individually and Grasshopper is a formal one, due to the existence of a  lease agreement between Mr. Taylor and Grasshopper for the lease of the building located at 1348 Pacheco St. Suite 206, Santa Fe, New Mexico. See Exhibit A (Lease).

5.      Upon information and belief, Defendant The Hartford Casualty Insurance Company ("Hartford") is a foreign corporation, doing business in New Mexico.

6.      At this time, Plaintiff is not seeking in excess of $75,000.

7.      Venue in this Court is proper.

## FACTS APPLICABLE TO ALL COUNTS

8.      Plaintiff Grasshopper is a Natural/Holistic medical provider that specializes in providing medical services such as therapeutic massage, Oriental Medicine, acupuncture, and herbal prescriptions, to its New Mexico patients.

9.      Mr. Taylor is not a lawyer.

10.     In 2009, Grasshopper had an insurance policy through Hartford policy (Policy No. 65 SBA NW9053 DX).

11.     Grasshopper was the named insured for that policy.

12.     Mr. Taylor, individually, as Grasshopper's landlord with a valid lease agreement between himself and Grasshopper, should have also been covered as an insured under Grasshopper's general liability coverage.

13.     Upon information and belief, that policy included, *inter alia*, originally workers compensation insurance for Plaintiff.

14. In 2009 Plaintiff, Grasshopper, advised Hartford that its mailing address had changed from 204 N. Guadalupe St. Suite C, Santa Fe NM 87501 to 1348 Pacheco St. Suite 206 Santa Fe, NM 87505.

15. On July 15, 2009, Hartford sent Grasshopper a "POLICY CHANGE" endorsement acknowledging this new mailing address change.

16. On July 15, 2010, Hartford sent Grasshopper a second "POLICY CHANGE" endorsement acknowledging this mailing address change.

17. In the 2010-2011 timeframe, Grasshopper paid premiums for, *inter alia*, worker's compensation coverage as part of the policy it purchased from Hartford.

18. Despite having twice acknowledged Grasshopper's correct mailing address, and unbeknownst to Plaintiffs, in 2011 Defendant sent Grasshopper's renewal papers for the workers' compensation coverage to the wrong address.

19. Hartford never followed up with a phone call or letter to the correct mailing address for Plaintiffs advising of the need to renew the workers' compensation policy, prior to its lapse.

20. Because of Hartford's negligence, Grasshopper's worker's compensation policy lapsed.

21. As a part of the underwriting process, at all material times, Hartford had in its possession an "audit form" in which Plaintiff Grasshopper disclosed that it had more than three (3) employees.

3

22.    Plaintiff was surprised when he received the cancellation letter form Hartford so he called the insurance company and spoke with a Hartford Employee.

23.    Hartford's employee told Mr. Taylor that it was his fault the policy was cancelled because he failed to timely renew the policy, despite the fact that Hartford sent the renewal letter to the wrong address, and failed to timely send the renewal to the correct address, and failed to otherwise advise Mr. Taylor that the renewal was due.

24.    Hartford told Mr. Taylor that he could renew his workers' compensation coverage but that he could only do so at an increased charge, and that Hartford would not provide coverage, retroactively, for the "gap" in coverage it had caused due to its failure to mail the renewal to the correct address.

25.    At this time, Mr. Taylor told Hartford he was not satisfied with its position, or customer service and that it was his belief that he did not need workers' compensation coverage because Grasshopper did not have the requisite number of employees to be required to carry workers' compensation coverage under New Mexico law.

26.    Mr. Taylor's belief on this issue was incorrect.  However, Defendant Hartford had in its possession an "audit form" detailing the number of employees Grasshopper had, and despite the fact that Hartford had superior knowledge to Mr. Taylor on the issue of how many employees were needed to trigger the requirement to carry workers' compensation insurance, Defendant Hartford failed to tell Mr. Taylor that he needed such coverage to be in compliance with New Mexico law.

4

27.     On December 10, 2013 Ms. Rose Gardner-Rael alleged she suffered a slip and fall accident on the Grasshopper premises.

28.     At that time, Ms. Rose Gardner-Rael was an employee of Grasshopper.

29.     During the December 10, 2013 timeframe, Grasshopper had a business liability insurance policy with Defendant Hartford, Policy No. 65 SBA ZR3068.  The general business liability coverage was provided pursuant to the Business Liability Coverage form SS008 0405.

30.     Mr. Taylor and Grasshopper subsequently tendered the claim to Hartford.

31.     Hartford denied Mr. Taylor's claim on the basis that, *inter alia*, he individually was not an additional insured under the policy.

32.     Hartford denied Grasshopper's claim, *inter alia*, on the basis that it did not have workers' compensation coverage at the time of the policy, and therefore a workers' compensation exclusion on the general liability policy applied to bar coverage.

33.     The Hartford did this despite the fact that the reason Grasshopper did not have such coverage was due to the Hartford's negligence, as described above.

34.     On June 26, 2014, Rose Gardner-Rael filed a lawsuit in state court, against Grasshopper and Mr. Taylor for her alleged slip and fall accident.

35.     During at least one telephonic phone call with the Hartford regarding Ms. Rose Gardner-Rael's claims, Mr. Taylor specifically asked the Hartford not to assist the Plaintiff in anyway with regard to her claims against Mr. Taylor and/or his company Grasshopper. In other words, Mr. Taylor specifically asked the Hartford not to help Plaintiff sue him better.

36.     The Hartford's adjuster told Mr. Taylor that it would not provide assistance to Ms. Rose Rael. Subsequently, Mr. Taylor wanted to avoid a situation where he, individually, would be without coverage in the event a plaintiff sued him for an accident occurring on the Grasshopper premises.

37.     Mr. Taylor contacted the Hartford and asked whether he needed to purchase additional insurance or submit additional documents in order to become an additional insured under Grasshopper's policy with the Hartford.

38.     At that time, the Hartford's employee asked for, and Mr. Taylor provided, his lease agreement with Grasshopper to Hartford. The Hartford's employee then told Mr. Taylor that "of course" he did not have to do anything to be covered under the existing Grasshopper policy, because as a landlord, he was automatically an additional insured.

39.     At that time, Ms. Gardner-Rael had not filed any claim or lawsuit with the New Mexico Worker's Compensation Administration related to her alleged slip and fall on Grasshopper's premises.

40.     To date, the Hartford has never defended, or indemnified Mr. Taylor against Ms. Rose Gardner-Rael's claims.

41.     To date, the Hartford has never defended or indemnified Grasshopper against Ms. Rose Rael-Gardner's claims.

42.     Prior to October 10, 2014, the Hartford never sought any declaratory judgment asking a New Mexico Court to determine whether there was coverage either for Grasshopper or Mr. Taylor.

6

43.     On October 10, 2014, Ms. Gardner-Rael filed an amended complaint in state court naming the Hartford as a party to her slip and fall lawsuit and seeking a coverage determination on the workers' compensation exclusion issue.

44.     Ms. Gardner-Rael's amended complaint did not add Mr. Taylor or Grasshopper as a party to the coverage issue.

45.     On December 1, 2014, the Hartford filed its answer to Ms. Gardner-Rael's Amended Complaint.

46.     The Hartford's counterclaim on this purported coverage issue was asserted solely against Ms. Rose Gardner-Rael, and did not include Plaintiffs as a party.

47.     The Hartford has attempted to obtain a coverage determination adverse to the interests of its insured, Grasshopper, and additional insured, Mr. Taylor, without naming Plaintiffs as a party to that action.

48.     At the time the Hartford filed its answer and counterclaim, it had the assistance of New Mexico counsel.

49.     New Mexico law is clear that an insurer cannot obtain an adjudication of a coverage issue without involving its insured as a necessary party to that litigation. The Hartford, with its experience writing policies and adjusting claims in New Mexico and with the benefit of its New Mexico Counsel, should have known that it could not assert a "counterclaim" on coverage against Ms. Gardner-Rael and not include Plaintiffs.

50.     The Hartford's "counterclaim" against Ms. Gardner-Rael went even further.  In its Counterclaim, the Hartford expressly asserted that "Ms. Rael has the right to purse her claims [against Grasshopper] under the New Mexico Worker's Compensation Act for her injuries."

51.     The Hartford's "counterclaim" against Ms. Gardner-Rael further asserts: "Ms. Rael can seek recovery from the New Mexico Uninsured Employers' Fund, even if her employer did not carry workers' compensation coverage."

52.     The Hartford's "counterclaim" against Ms. Gardner-Rael further asserts: "Ms. Rael's slip and fall and resulting injuries are excluded under The Policy because the injury occurred on the job, and therefore, Ms. Rael's employer, Grasshopper Natural Medicine, is liable under New Mexico worker's compensation laws."

53.     The Hartford's helpful legal advice, as articulated through its counsel, in its "counterclaim" was for Ms. Gardner-Rael to leave the Hartford alone and go file an additional lawsuit against its own insureds. This is exactly what Mr. Taylor asked The Hartford not to do, and exactly what the Hartford's employee promised it would not do.

54.     In giving Ms. Gardner-Rael helpful legal advice on how to sue its insureds better, the Hartford put its own interests above that of its insureds.

55.     On January 8, 2015, Ms. Gardner-Rael followed the Hartford's friendly legal advice and filed a second lawsuit against Grasshopper in the New Mexico Workers' Compensation Administration, adding the New Mexico Uninsured Employers' Fund as a party.

8

56.     NMSA 1978, § 52-1-9.1 empowers the New Mexico Uninsured Employers' Fund to penalize an employer who fails to have workers compensation insurance, and seek subrogation against an employer for any money paid to an alleged injured worker out of the fund.

57.     In giving Ms. Gardner-Rael helpful legal advice, the Hartford, and its New Mexico counsel, have exposed the Hartford's insureds to additional penalties, and arguably even made admissions that Ms. Gardner-Rael has a compensable workers' compensation claim.

58.     In giving Ms. Gardner-Rael helpful legal advice, the Hartford, and its New Mexico Counsel, have exposed its insured to the potential of parallel litigation in both state court and the New Mexico Workers' Compensation Administration.

## COUNT I: BREACH OF CONTRACT BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

59.     Plaintiff incorporates by reference all prior allegations as if set forth herein in full.

60.     The insurance policies, Policy No. 65 SBA ZR3068 and Policy No. 65 SBA NW9053 DX, were valid contracts as recognized under New Mexico law.  The forms themselves were offers, which were accepted by Plaintiffs when they filled it out and paid premiums.

61.     The contracts were also supported by good and valuable consideration.

62.     By denying Plaintiffs' claims, despite the fact that Rose Gardner-Rael's lawsuit was not filed in workers compensation, but in state court under tort theories, Defendant breached its contracts with Plaintiffs.

63.     In New Mexico, there is a duty of good faith and fair dealing written into every contract, regardless of whether it is spelled out expressly.

64.    By virtue of failing to conduct a timely and reasonable investigation into Plaintiffs' claims, failing to timely send the workers compensation renewal to Plaintiff's correct address, failing to add Mr. Taylor as an additional insured, attempting to litigate coverage issues in the absence of its insureds, and helping Ms. Rose Gardner-Rael to timely file a claim before the New Mexico Workers' Compensation Administration, Defendant breached that duty to Plaintiffs.

65.    As the proximate and direct cause of Defendant's breach of contract and breach of the duty of good faith and fair dealing, Plaintiff has been damaged in an amount to be proven at trial.

66.    Defendants conduct was willful, wanton, or reckless such that it would be appropriate for the jury to award punitive damages in order to deter Defendant from further similar conduct in the future.

## COUNT II: INSURANCE BAD FAITH

67.    Plaintiff incorporates by reference all prior allegations as if set forth herein in full.

68.    There is implied in every insurance policy a duty on the part of the insurance company to deal fairly with the policy holder.

69.    Fair dealing means to act honestly and in good faith in the performance of the contract.

70.    The insurance company must give equal consideration to its own interests and the interests of the policy holder.

71. An insurance company is obligated to look for insurance coverage, not to look for reasons to deny coverage.

72. In addition, the duty to defend in New Mexico is far greater than the duty to indemnify. An insurance company has a duty to defend if the claim even arguably falls within coverage.

73. Ms. Rose Gardner-Rael's tort allegations arguably fell within the coverage provided by Hartford for Grasshopper, Mr. Taylor, or both.

74. An insurance company and its employees act in bad faith when they refuse to pay a claim of the policyholder for reasons which are improper or unfounded.

75. Defendant's decision not to at least defend Plaintiffs was frivolous.

76. Defendant's decision to attempt to litigate coverage in the absence of its insured was improper.

77. In deciding whether to pay a claim, the insurance company and its employees must act reasonably under the circumstances to conduct a timely and fair investigation and evaluation of the claim.

78. An insurer and its employees and agents may not unreasonably delay notification to the policyholder that the claim will be paid or denied.

79. A failure to timely investigate, evaluate, and/or pay a claim is a bad faith breach of the duty to act honestly and in good faith in the performance of the insurance contract.

80. The acts and failures to act of Defendant as enumerated above constitute a breach of their duty of good faith to Plaintiff.

81.     As a direct result of the bad faith of Defendant, Plaintiffs have suffered damages, and seek compensatory damages in a monetary amount to be determined at trial.

82.     The acts and failures to act of Defendant as enumerated above, constitute an unreasonable failure to pay a first party coverage claim, entitling Plaintiff to an award of reasonable attorney fees and costs pursuant to NMSA 1978, §39-2-1.

83.     The actions of Defendants were malicious, willful, reckless, wanton, oppressive, in bad faith and/or fraudulent, entitling Plaintiff to recover punitive damages in an amount to be determined at trial.

### COUNT III: UNFAIR INSURANCE CLAIMS PRACTICES

84.     Plaintiffs incorporate by reference all prior allegations as if set forth herein in full.

85.     The acts and failures to act of Defendants, as enumerated above, constitute unfair claims practices which are prohibited pursuant to the New Mexico Unfair Insurance Claims Practices Act, NMSA 1978, §59A-16-20.

86.     As a direct and proximate result of the unfair claims practices of Defendant, Plaintiffs have suffered damages in a monetary amount to be determined at trial.

87.     Plaintiff is also entitled to an award of attorney fees and costs under the statute.

### COUNT IV: UNFAIR TRADE PRACTICES

88.     Plaintiffs incorporate by reference all prior allegations as if set forth herein in full.

89.     The acts and failures to act by Defendant, as enumerated above, constitute unfair and deceptive trade practices and unconscionable trade practices which are illegal and prohibited pursuant to the New Mexico Unfair Trade Practices Act, NMSA 1978, §§57-12-1.

90.     As a direct result of Defendant's unfair and deceptive trade practices and unconscionable trade practices, Plaintiffs have suffered damages in a monetary amount to be determined at trial.

91.     Plaintiff is also entitled to attorney fees, statutory and treble damages for violations of the Unfair Trade Practices Act.

92.     The acts and failures to act by Defendant were malicious, willful, reckless, wanton, oppressive, in bad faith and/or fraudulent, entitling Plaintiffs to recover punitive damages in an amount to be determined at trial.

### COUNT V: BREACH OF FIDUCIARY DUTY

93.     Plaintiff incorporate by reference all prior allegations as if set forth herein in full.

94.     Defendant's duties to Plaintiffs were non-delegable duties, such that Defendants are liable to Plaintiffs for each and every violation of these duties, whether committed directly by Defendant or by any of its employees or agents.

95.     There is implied in every insurance policy a duty on the part of the insurance company to deal fairly with the policyholder and insureds like Plaintiffs.

96.     The relationship between Hartford and Plaintiffs was also one of trust, where Plaintiffs relied on Hartford to deal with them fairly.

97.     Defendant put its interests above its insureds with its claims handling and other treatment of Plaintiffs, including its decision to give Ms. Rose Gardner-Rael helpful legal advice on how to timely sue its own insured better.

98.     Defendant has given Plaintiffs inconsistent information as to whether Mr. Taylor was an additional insured under the policy.

99.     Defendant has acted negligently with regard to the renewal of Grasshopper's workers compensation coverage and then attempted to improperly blame Grasshopper for the lapse of that coverage.

100.    Defendants also breached their fiduciary duties by engaging in the above conduct and by failing to pay Plaintiff's claim, at a minimum, Defendants should have defended Plaintiffs under a reservation of rights pending resolution of a declaratory judgment action on coverage that included Plaintiffs as parties.

101.    As a result of Defendant's breach of fiduciary duties, Plaintiffs have been injured in an amount to be proven at the time of trial.

## COUNT VI: NEGLIGENCE & PROFESSIONAL NEGLIGENCE

102.    Plaintiffs incorporate by reference all prior allegations as if set forth herein in full.

103.    Upon information and belief, Defendants planned, directed and put into operation the conduct and actions that resulted in an unjustified cancellation of Plaintiffs' workers' compensation coverage arising from the wrongful conduct described herein.

104.    Defendants also possessed superior information to Plaintiffs on when an employer should be covered under the workers' compensation statutes and should have at least advised Plaintiffs that Grasshopper needed to buy such coverage.

105.    As a result of the negligence of Defendant, Plaintiffs have suffered damages as enumerated herein.

14

106.    The acts and failures to act by Defendant were malicious, willful, reckless, wanton, oppressive, in bad faith and/or fraudulent, entitling Plaintiffs to recover punitive damages in an amount to be determined at trial.

107.    Because Plaintiffs have just initiated this litigation, the policy amount purchased and this lawsuit, and Ms. Rael's lawsuits are in their i infancy, Plaintiffs presently value all of their claims in an amount less than $75,000 (seventy five thousand dollars).

108.    Plaintiff reserves their right to increase their valuation of their claims above the threshold jurisdictional amount for Federal Court, should the facts and circumstances as gleaned through the discovery process warrant such a re-evaluation.

**WHEREFORE**, Plaintiffs pray for judgment against Defendant for all damages as determined at trial, together with the costs of this litigation, pre-judgment and post-judgment interest, reasonable attorney's fees, punitive damages, as well as an early mediation at Defendants' expense as set forth in NMSA 1978 §57-12-1 et seq, and for such other relief as the Court may deem just and proper.

LAW OFFICE OF GEORGE "DAVE" GIDDENS, P.C.

By: */s/ H. Jesse Jacobus, III*
Electronically Filed 1.28.15
H. Jesse Jacobus, III
10400 Academy, Suite 350
Albuquerque, NM 87111
Telephone: (505) 271-1053
Facsimile: (505) 271-4848
jjacobus@giddenslaw.com

*Attorneys for Plaintiff*



EXHIBIT
A

# New Mexico Commercial Lease Agreement
## 1348 Pacheco Street, Suite 206. Santa Fe, NM 87505

This Commercial Lease Agreement ("Lease") is made and effective August 10, 2009, by and between Brandon D. Taylor ("Landlord") and Grasshopper Natural Medicine LLC dba Mountain Spirit Integrative Medicine, ("Tenant").

Landlord is the owner of premises and improvements commonly known and numbered as 1348 Pacheco Street, Suite 206 in Santa Fe, NM 87505 ("Leasd Premises"). Leased Premises are located within the Byzantium Condominium Building ("Building").

Landlord makes available for Lease "as-is", the entirety of Suite 206 within the Byzantium Condominium Building. The general common elements of the Building are available for use by Tenant as set forth in Condominium Declaration for Byzantium Condominium ("Byzantium Condominium Declarations" or "Declarations"), under official management by the Byzantium Association, a NM registered Home Owners Association ("HOA").

Landlord desires to Lease the Leased Premises to Tenant, and Tenant desires to Lease the Leased Premises from the Landlord for the Term(s), Rental Rate(s) and upon the covenants, conditions and provisions herein set forth.

THEREFORE, in consideration of the mutual promises herein, contained and other good and valuable consideration, it is agreed:

### 1. Term.

Landlord hereby Leases the Leased Premises to Tenant, and Tenant hereby Leases the same from Landlord, for an "Initial Term" of two (2) years, beginning 10 August 2009 and commencing 31 August 2011. Afterward the Lease shall automatically transfer to a "Month-to-Month Term" of Lease. Once the "Initial Term" is complete, either party may end the Month-To-Month Term of Lease via written notice at least 30 days in advance of lease termination. Landlord shall provide Tenant possession of unit for full use beginning today.

### 2. Rent.

A. Tenant shall pay to Landlord as stated below:
During "Initial Term": $3,600.00 Monthly Base Rent, beginning September 1, 2009. (First month August 2009 free rent.)
During "Month to Month Term" beginning September 1, 2011: Landlord may advise Tenant at any time after Initial Term, of new Monthly Rent. Landlord promises not to increase Monthly Rent by more than 25% over Base Rent, for at least the first 3 years upon entering Month-To-Month Term. Should lease continue beyond 5 year term, Landlord will notify tenant at least 30 days in advance of any further increases to Month to Month Term's Monthly Rental Rate.

Each installment payment shall be due in advance on the first day of each calendar month during the lease term (Beginning September 1, 2009) to Landlord via check payable to Spaces for Wellness LLC; or in such other place or means designated by notice from Landlord to Tenant. The rental payment amount for any partial calendar months included in the Lease term shall be prorated on a daily basis.

B. No "Security Deposit" is due under this Lease.



Landlord Initials

-1-

DBT

Tenant Initials

**3. Use.**

The Leased Premises are to be used for the operation of a health care office and related services to include acupuncture, massage, body work and healing etc, and for no other unrelated purpose, without the prior written consent of Landlord. Tenant will at no time exceed occupancy limit. Tenant will not commit any waste upon the Leased Premises, or create any nuisance or take any act, which may disturb the quiet enjoyment of the Building. Notwithstanding the foregoing, Tenant shall not use the Leased Premises for the purposes of storing, manufacturing or selling any explosives, flammables, or other inherently dangerous substances, chemical, thing or device.

**4. Sublease and Assignment.**

Tenant shall have the right without Landlord's consent, to assign this Lease to a corporation with which Tenant may merge or consolidate, to any subsidiary or dba of Tenant, to any corporation under common control with Tenant, or to a purchaser of substantially all of Tenant's assets. Except as set forth above, Tenant shall not sublease all or any part of the Leased Premises, or assign this Lease in whole or in part without Landlord's consent, such consent not to be unreasonably withheld or delayed.

**5. Repairs.**

During the Lease Term(s), Tenant shall make, at Tenant's expense, all necessary repairs to the interior of Leased Premises. Repairs shall include such items as routine repairs of the surface of floors, walls, ceilings, and other parts of the Leased Premises damaged or worn beyond normal occupancy. If Tenant causes malfunction of the sewer system, Tenant shall be responsible for the cost of repair to the system.

**6. Alterations and Improvements.**

Tenant, at Tenant's expense, shall have the right with Landlord's consent, to remodel, redecorate, and make additions, improvements and replacements of and to all or any part of the Leased Premises from time to time as Tenant may deem desirable, provided the same are made in a workmanlike manner and utilizing good quality materials. Tenant shall have the right to place and install personal property, trade fixtures, equipment and other temporary installations in and upon the Leased Premises, and fasten the same to the premises. All personal property, equipment, machinery, trade fixtures and temporary installations, whether acquired by Tenant at the commencement of the Lease term or placed or installed on the Leased Premises by Tenant thereafter, shall remain Tenant's property free and clear of any claim by Landlord. Tenant shall have the right to remove the same at any time during the term of this Lease provided that all damage to the Leased Premises caused by such removal shall be repaired by Tenant at Tenant's expense.

**7. Property Taxes and Homeowners Association Fees.**

Landlord shall pay property taxes and HOA fees on behalf of Leased Premises, included within the cost of Tenant's Monthly Rental Rate(s) as detailed in Section 2 above.

**8. Insurance.**

A. If the Leased Premises or any other part of the Building is damaged by fire or other casualty resulting from any act or negligence of Tenant or any of Tenant's agents, employees or invitees, rent shall not be diminished or abated while such damages are under repair, and Tenant shall be responsible for the costs of repair not covered by insurance.

B. Tenant shall be responsible, at its own expense, for fire and extended coverage insurance on all of its personal property, including removable trade fixtures, located in the Leased Premises.


Landlord Initials

- 2 -

DBI
Tenant Initials

C. In addition to the above coverage, Tenant shall, at its own expense, maintain a policy or policies of comprehensive general liability insurance with respect to their respective activities in the Building or Common Areas with the premiums thereon fully paid on or before due date, issued by and binding upon an insurance company approved by the Landlord, such insurance to afford minimum protection of not less than $2,000,000.00 general aggregate coverage of liability and property damage. Landlord shall not be required to maintain insurance against thefts within the Leased Premises or the Building.

## 9. Utilities.
Tenant shall pay all charges for water, sewer, gas, electricity, telephone and other services and utilities used by Tenant on the Leased Premises during the term of this Lease unless otherwise expressly agreed in writing by Landlord with thirty (30) days notice given to Tenant.

## 10. Signs.
With Landlord's prior consent, Tenant shall have the right to place a sign or sign(s) on the Leased Premises, in compliance with Byzantium Condominium Declarations requirements; and so long as such signs are permitted by applicable zoning ordinances and private restrictions. Landlord may refuse consent to any proposed signage that is in Landlord's opinion too large, deceptive, unattractive or otherwise inconsistent with or inappropriate to the Leased Premises or use of any other tenant. Landlord shall assist and cooperate with Tenant in obtaining any necessary permission from governmental authorities or adjoining owners and occupants for Tenant to place or construct foregoing signs. Tenant shall repair all damage to the Leased Premises resulting from the removal of signs installed by Tenant.

## 11. Entry.
Landlord shall have the right to enter upon the Leased Premises at reasonable hours to inspect the same, provided Landlord shall not thereby unreasonably interfere with Tenant's business on the Leased Premises.

## 12. Common Areas.
A. Parking: During the Term(s) of this Lease, Tenant shall have the use of Parking as described by the HOA in the Byzantium Condominium Declarations. Tenant shall have no right to subleasing.

B. Other Common Areas: The roof garden, hallways, stairwells, elevator, entry, parking lot, and all other areas situated on or in the Property which are designated Common Elements by the HOA, may be used by Tenant and all of Tenant's guest, in accordance with the Byzantium Condominium Declarations. Tenant is responsible to keep clean and maintain any Common Areas used for any purpose.

## 13. Building Rules.
Tenant will comply with the rules of the Building adopted by the HOA Byzantium Association, and will cause all of its agents, employees, invitees, guests and visitors to do so as well.

## 14. Damage and Destruction.
Subject to Section 8 above, if the Leased Premises or any pert thereof or any appurtenance thereto is so damaged by fire, casualty or structural defects that the same cannot be used for Tenant's purposes, then Tenant shall have the right within ninety (90) days following damage to elect by notice to Landlord to terminate this Lease as of the date of such damage. In the event of minor damage to any part of the Leased Premises, and if such damage does not render the Leased Premises unusable for Tenant's purposes, Landlord shall promptly repair such damage at the cost


Landlord Initials

- 3 -

DBT
Tenant Initials

of the Landlord. In making the repairs called for in this paragraph, Landlord shall not be liable for any delays resulting from strikes, governmental restrictions, inability to obtain necessary materials or labor or other matters which are beyond the reasonable control of Landlord. Tenant shall be relieved from paying rent and other charges during any portion of the Lease term that the Leased Premises are inoperable or unfit for occupancy, or use, in whole or in part, for Tenant's purposes. Rentals and other charges paid in advance for any such periods shall be credited on the next ensuing payments, if any, but if no further payments are to be made, any such advance payments shall be refunded to Tenant. The provisions of this paragraph extend not only to the matters aforesaid, but also to any occurrence which is beyond Tenant's reasonable control and which renders the Leased Premises, or any appurtenance thereto, inoperable or unfit for occupancy or use, in whole or in part, for Tenant's purposes.

### 15. Default.

If default shall at any time be made by Tenant in the payment of rent when due to Landlord as herein provided, and if said default shall continue for fifteen (15) days after written notice thereof shall have been given to Tenant by Landlord, or if default shall be made in any of the other covenants or conditions to be kept, observed and performed by Tenant, and such default shall continue for thirty (30) days after notice thereof in writing to Tenant by Landlord without correction thereof then having been commenced and thereafter diligently prosecuted, Landlord may declare the term of this Lease ended and terminated by giving Tenant written notice of such intention, and if possession of the Leased Premises is not surrendered, Landlord may reenter said premises. Landlord shall have, in addition to the remedy above provided, any other right or remedy available to Landlord on account of any Tenant default, either in law or equity. Landlord shall use reasonable efforts to mitigate its damages.

### 16. Quiet Possession.

Landlord covenants and warrants that upon performance by Tenant of its obligations hereunder, Landlord will keep and maintain Tenant in exclusive, quiet, peaceable and undisturbed and uninterrupted possession of the Leased Premises during the term of this Lease.

### 17. Condemnation.

If any legally, constituted authority condemns the Building or such part thereof which shall make the Leased Premises unsuitable for leasing, this Lease shall cease when the public authority takes possession, and Landlord and Tenant shall account for rental as of that date. Such termination shall be without prejudice to the rights of either party to recover compensation from the condemning authority for any loss or damage cause by the condemnation. Neither party shall have any rights in or to any aware made to the other by the condemning authority.

### 18. Subordination.

Tenant accepts this Lease subject and subordinate to any mortgage, deed or trust or other lien presently existing or hereafter arising upon the Leased Premises, or upon the Building and to any renewals, refinancing and extensions thereof, but Tenant agrees that any such mortgagee shall have the right at any time to subordinate such mortgage, deed or trust or other lien to this Lease on such terms and subject to such conditions as such mortgagee may deem appropriate in its discretion. Landlord is hereby irrevocably vested with full power and authority to subordinate this Lease to any mortgage, deed of trust or other lien now existing or hereafter placed upon the Leased Premises of the Building, and Tenant agrees upon demand to execute such further instruments subordinating this Lease or attorning to the holder of any such liens as Landlord may request. In the event that Tenant should fail to execute any instrument of subordination herein required to be executed by Tenant promptly as requested, Tenant hereby irrevocably constitutes Landlord as its attorney-in-fact to execute such instrument in Tenant's name, place and stead, it being agreed that such power is on coupled with an interest. Tenant agrees that it will from time to time upon request by Landlord execute and deliver to such persons as Landlord shall request a statement in recordable


Landlord Initials

- 4 -


Tenant Initials

form certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force as so modified), stating the dates to which rent and other charges payable under this Lease have been paid, stating that Landlord is not in default hereunder (or if Tenant alleges a default stating the nature of such alleged default) and further stating such other matters as Landlord shall reasonably require.

### 19. Notice.
Any notice required or permitted under this Lease shall be deemed sufficiently given or served if sent by United States certified mail, return receipt requested, addressed as follows:

If to Landlord to Brandon Taylor, 1279 Senda del Valle, Santa Fe, NM 87507.
If to Tenant to Grasshopper Natural Medicine LLC, 1348 Pacheco Street, Suite 206, Santa Fe, NM 87505.

Landlord and Tenant shall each have the right to from time to time to change the place notice is to be given under this paragraph by written notice thereof to the other party.

### 20. Brokers.
Tenant represents that Tenant was not shown the Premises by any real estate broker or agent and that Tenant has not otherwise engaged in, any activity which could form the basis for a claim for real estate commission, brokerage fee, finder's fee or other similar charge, in connection with this Lease.

### 21. Waiver.
No waiver of any default of Landlord or Tenant hereunder shall be implied from any omission to take any action on account of such default if such default persists or is repeated, and no express waiver shall affect any default other than the default specified in the express waiver and that only for the time and to the extent therein stated. One or more waivers by Landlord or Tenant shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition.

### 22. Memorandum of Lease.
The parties hereto contemplate that this Lease should not and shall not be filed for record, but in lieu thereof, at the request of either party, Landlord and Tenant shall execute a Memorandum of Lease to be recorded for the purpose of giving record notice of the appropriate provisions of this Lease.

### 23. Headings.
The headings used in this Lease are for convenience of the parties only and shall not be considered in interpreting the meaning of any provision of this Lease.

### 24. Successors.
The provisions of this Lease shall extend to and be binding upon Landlord and Tenant and their respective legal representatives, successors and assigns.

### 25. Consent.
Landlord shall not unreasonably withhold or delay its consent with respect to any matter for which Landlord's consent is required or desirable under this Lease.

### 26. Performance.


Landlord Initials

- 5 -

D BT
Tenant Initials

If there is a default with respect to any of Landlord's covenants, warranties or representations under this Lease, and if the default continues more than fifteen (15) days after notice in writing from Tenant to Landlord specifying the default, Tenant may, at its option and without affecting any other remedy hereunder, cure such default and deduct the cost thereof from the next accruing installment or installments of rent payable hereunder until Tenant shall have been fully reimbursed for such expenditures, together with interest thereon at a rate equal to the lessor of twelve percent (12%) per annum or the then highest lawful rate. If this Lease terminates prior to Tenant's receiving full reimbursement, Landlord shall pay the un-reimbursed balance plus accrued interest to Tenant on demand.

## 27. Compliance with Law.
Tenant shall comply with all laws, orders, ordinances, and other public requirements now or hereafter pertaining to Tenant's use of the Leased Premises.  Landlord shall comply with all laws, orders, ordinances and other public requirements now or hereafter affecting the Leased Premises.

## 28. Final Agreement.
This Agreement terminates and supersedes all prior understandings or agreements on the subject matter hereof. This Agreement may be modified only by a further writing that is duly exceeded by both parties.

## 29. Governing Law.
This Agreement shall be governed, construed and interpreted by, through and under the Laws of the State of New Mexico.

## 30. Holding Over.
Tenant shall vacate the Property upon the expiration or earlier termination of this Lease.  Tenant shall reimburse Landlord and indemnify Landlord against all damages incurred by Landlord from any delay by Tenant in vacating the property which damages are not caused by Landlord.  Tenant's occupancy of the Property after the Initial Term shall be the Month-to-Month Term as described in Section 1, subject to all terms of the Lease.  Tenant shall notify Landlord thirty days prior to moving out during any holdover following the Lease Term.

## 31. Indemnity.
A.  Tenant shall save Landlord harmless, defend, and indemnify Landlord from all injury, loss, claims, or damage to any person or property while on the Leased Premises and/or the Building within which the Leased Premises are located, including costs and reasonable attorneys' fees, caused by the acts, negligence, willful misconduct, or default of Tenant, its employees, agents, licensees, or contractors (but excluding that portion caused by the negligence or willful misconduct of Landlord, its agents, licensees, employees, or contractors).

B.  To the extent, if at all, Section 56-7-1 NMSA 1978 (1971) is applicable to any indemnification set forth in this Lease, this indemnification will not extend to liability, claims, damages, losses or expenses the indemnification for which is prohibited by Section 56-7-1.

## 32. Condition Upon Termination.
Upon the termination of the Lease, Tenant shall surrender the Property to Landlord, broom-cleaned and in the same condition as received at commencement of the Lease, except for ordinary wear and tear which Tenant was not otherwise obligated to remedy under any provision of this Lease.  Landlord may require Tenant to remove any alterations, additions or improvements (whether or not made with Landlord's consent) prior to the termination of the Lease and to restore the Property to its prior condition, all at Tenant's expense.  All alterations, additions, and improvements which Landlord has not required Tenant to remove shall become Landlord's property and shall be



Landlord Initials

-6-



Tenant Initials

surrendered to Landlord upon the termination of the Lease, except that Tenant may remove any of Tenant's machinery or equipment which can be removed without material damage to the Property. Tenant shall repair, at Tenant's expense, any damage to the Property cause by the removal of any such machinery or equipment.

In the event that Tenant abandons any of its property, Landlord may either retain the property or dispose of it at Tenant's expense and without accountability in whatever manner Landlord may see fit. If Landlord causes the property to be removed, any damage caused by the removal and any other damage to the Property caused by Tenant's removal may be repaired at Tenant's expense and Tenant shall pay to Landlord upon demand all such expenses. The above provisions shall survive the expiration or termination of this Lease.

### 33.  Arbitration of Disputes Between Landlord and Tenant.

Any existing or future controversy between Landlord and Tenant of whatsoever kind shall be submitted to binding arbitration pursuant to the New Mexico Uniform Arbitration Act, Section 44-7-A-1, et seq., NMSA 1978. The venue for that arbitration shall be in the County of Santa Fe, State of New Mexico. As to any claim, the parties shall first use their best efforts to agree upon an arbitrator acceptable to both. If the parties are unable to agree upon a mutually acceptable arbitrator within thirty (30) days from the date of the original written claim in arbitration, then with all reasonable dispatch each party shall appoint one arbitrator and those arbitrators shall appoint another arbitrator. All arbitrators shall then hear the arbitration as soon as practicable. If the controversy is heard by one (1) arbitrator, then the expense of that arbitrator shall be paid equally by each side. If more than one arbitrator hears the matter, then the losing party as determined by the arbitrators shall bear all expense of the arbitrators. The nonprevailing party shall pay the attorneys' fees, costs and expenses of the prevailing party, except the cost of the arbitrators described above.

### 34. Personal Guarantee.

By executing this Commercial Lease Agreement, Landlord and Tenant has personally and individually guaranteed timely performance of all obligations under this Lease.

IN WITNESS WHEREOF, the parties have executed this Lease as of the day and year first above written.


_____
Landlord, Brandon D. Taylor


_____
Tenant, Grasshopper Natural Medicine LLC dba Mountain Spirit Integrative Medicine
Representative: Dr. Brandon Taylor, DOM


Landlord Initials                         - 7 -                         Tenant Initials

FILED IN MY OFFICE
DISTRICT COURT CLERK
1/28/2015 4:52:31 PM
STEPHEN T. PACHECO
Salvador Hernandez

FIRST JUDICIAL DISTRICT COURT
STATE OF NEW MEXICO
COUNTY OF SANTA FE

GRASSHOPPER NATURAL MEDICINE LLC, and
BRANDON TAYLOR, individually,

        Plaintiff,

v.

                                    No. _____ D-101-CV-2015-00318

THE HARTFORD CASUALTY
INSURANCE COMPANY,

        Defendant.

## SIX PERSON JURY DEMAND

    Plaintiffs hereby request that the trial of this matter be heard by a jury of six (6) persons.

Plaintiff hereby tenders to the Clerk of the District Court the sum of $150.00.

                    LAW OFFICE OF GEORGE "DAVE" GIDDENS, P.C.


                    By: */s/ Jesse Jacobus, III*
                        H. Jesse Jacobus, III
                        Electronically filed 1.28.15
                        10400 Academy NE, Suite 350
                        Albuquerque, NM 87111
                        505-271-1053
                        505-271-4848 fax
                        jjacobus@giddenslaw.com
                        *Attorneys for Plaintiffs*

FILED IN MY OFFICE
DISTRICT COURT CLERK
1/29/2015 10:51:11 AM
STEPHEN T. PACHECO
Jorge Montes

FIRST JUDICIAL DISTRICT COURT
STATE OF NEW MEXICO
COUNTY OF SANTA FE

GRASSHOPPER NATURAL MEDICINE LLC, and
BRANDON TAYLOR, individually,

        Plaintiff,

v.

                                 D-101-CV-2015-00318

THE HARTFORD CASUALTY
INSURANCE COMPANY,

        Defendant.

## PLAINTIFF BRANDON TAYLOR'S NOTICE OF PEREMPTORY ELECTION TO EXCUSE JUDGE

COMES NOW Plaintiff, Brandon Taylor, by and through his counsel of record, Law

Office of George "Dave" Giddens, P.C. (H. Jesse Jacobus, III) and pursuant to Rule 1-088.1.C(1)

NMRA, hereby exercises his peremptory right to excuse Judge David K. Thomson from hearing

the above-captioned case.

                    LAW OFFICE OF GEORGE "DAVE" GIDDENS, PC

                    By: /s/ H. Jesse Jacobus
                          H. Jesse Jacobus, III
                          Electronically filed on 1.29.15
                          10400 Academy NE, Suite 350
                          Albuquerque, NM 87111
                          Telephone: (505) 271-1053
                          Facsimile:  (505) 271-4848

**XC: LEAD**

                          *Attorneys for Plaintiffs*

FILED IN MY OFFICE
DISTRICT COURT CLERK
2/2/2015 1:34:31 PM
STEPHEN T. PACHECO
Gloria Landin

FIRST JUDICIAL DISTRICT COURT
COUNTY OF SANTA FE
STATE OF NEW MEXICO

D-101-CV-201500318

GRASSHOPPER NATURAL MEDICINE LLC, and
BRANDON TAYLOR,

      PLAINTIFFS,

V.

THE HARTFORD CASUALTY
INSURANCE COMPANY,

      DEFENDANT,

## NOTICE OF JUDGE ASSIGNMENT

The above referenced cause has been reassigned to District Judge RAYMOND Z. ORTIZ Division III, effective January 29, 2015, due to the **EXCUSAL** of District Judge DAVID K. THOMSON, District Judge, Division VI.

                STEPHEN T. PACHECO
                CLERK OF THE DISTRICT COURT

                BY: /S/ Adrian Olivas
                Deputy

## CERTIFICATE

I hereby certify that a true and correct copy of the foregoing was e-filed, e- mailed or mail to counsel/parties on the 2nd day of February 2015. (All parties listed in the Odyssey E-File & Service Contacts )

                STEPHEN T. PACHECO
                CLERK OF THE DISTRICT COURT

                BY:
                Deputy

FILED IN MY OFFICE
DISTRICT COURT CLERK
2/11/2015 9:00:09 AM
STEPHEN T. PACHECO
Jorge Montes

**4-206. Summons.**

# ISSUED

| SUMMONS | |
|---|---|
| District Court: FIRST JUDICIAL<br>Santa Fe County, New Mexico<br>Court Address:<br>Post Office Box 2268 / 225 Montezuma Ave<br>Santa Fe, New Mexico   87504-2268<br>Court Telephone No.: 505-455-8250 | Case Number:  D-101-CV-2015-318<br><br>Assigned Judge:  Raymond Z. Ortiz |
| Plaintiff(s): GRASSHOPPER NATURAL MEDICINE, LLC, and BRANDON TAYLOR, individually,<br><br>v.<br><br>Defendant(s): THE HARTFORD CASUALTY INSURANCE COMPANY | Defendant<br>Name:   The   Hartford   Casualty<br>            Insurance   Company<br>            c/o Office of Superintendent<br>            of Insurance<br>Address:  P.O. Box 1689<br>            Santa Fe, NM 87504 |

## TO THE ABOVE NAMED DEFENDANT(S): Take notice that

1.      A lawsuit has been filed against you.  A copy of the lawsuit is attached.  The Court issued this Summons.

2.      You must respond to this lawsuit in writing.  You must file your written response with the Court no later than thirty (30) days from the date you are served with this Summons.  (The date you are considered served with the Summons is determined by Rule 1-004 NMRA)  The Court's address is listed above.

3.      You must file (in person or by mail) your written response with the Court.  When you file your response, you must give or mail a copy to the person who signed the lawsuit.

4.      If you do not respond in writing, the Court may enter judgment against you as requested in the lawsuit.

5.      You are entitled to a jury trial in most types of lawsuits.  To ask for a jury trial, you must request one in writing and pay a jury fee.

6.      If you need an interpreter, you must ask for one in writing.

7.      You may wish to consult a lawyer.  You may contact the State Bar of New Mexico for help finding a lawyer at www.nmbar.org; 1-800-876-6657; or 1-505-797-6066.

Dated at Santa Fe, New Mexico, this 11ᵗʰ day of February, 2015.



STEPHEN T. PACHECO
CLERK OF THE DISTRICT COURT

BY: _Salvador Hernandez_
          Deputy

/H. Jesse Jacobus, III
ttorney for Plaintiff
ame:  H. Jesse Jacobus, III
ie Law Office of George "Dave" Giddens, P.C.
ddress:  10400 Academy NE, Suite 350
elephone No.:  (505) 271-1053
ιx No.:  (505) 271-4848
nail Address:  jjacobus@giddenslaw.com

THIS SUMMONS IS ISSUED PURSUANT TO RULE 1-004 OF THE NEW MEXICO RULES OF CIVIL PROCEDURE FOR DISTRICT COURTS.

**4-206. Summons.**

**RETURN[1]**

STATE OF NEW MEXICO  )
                              )ss
COUNTY OF _____)

I, being duly sworn, on oath, state that I am over the age of eighteen (18) years and not a party to this lawsuit, and that I served this summons in _____ county on the _____ day of _____, _____, by delivering a copy of this summons, with a copy of complaint attached, in the following manner:

**(check one box and fill in appropriate blanks)**

[ ]     to the defendant _____ (*used when defendant accepts a copy of summons and complaint or refuses to accept the summons and complaint*)

[ ]     to the defendant by [mail] [courier service] as provided by Rule 1-004 NMRA (*used when service is by mail or commercial courier service*).

After attempting to serve the summons and complaint on the defendant by personal service or by mail or commercial courier service, by delivering a copy of this summons, with a copy of complaint attached, in the following manner:

[ ]     to _____, a person over fifteen (15) years of age and residing at the usual place of abode of defendant _____, (*used when the defendant is not presently at place of abode*) and by mailing by first class mail to the defendant at _____ (*insert defendant's last known mailing address*) a copy of the summons and complaint.

[ ]     to _____, the person apparently in charge at the actual place of business or employment of the defendant and by mailing by first class mail to the defendant at _____ (*insert defendant's business address*) and by mailing the summons and complaint by first class mail to the defendant at _____ (*insert defendant's last known mailing address*).

[ ]     to _____, an agent authorized to receive service of process for defendant _____.

[ ]     to _____, [parent] [guardian] [custodian] [conservator] [guardian ad litem] of defendant _____ (*used when defendant is a minor or an incompetent person*).

**4-206. Summons.**

[ ]   to _____ (*name of person*), _____, (*title of person authorized to receive service. Use this alternative when the defendant is a corporation or an association subject to a suit under a common name, a land grant board of trustees, the State of New Mexico or any political subdivision*).

Fees: _____

_____
Signature of person making service

_____
Title (*if any*)

Subscribed and sworn to before me this _____ day of _____, _____ [2]

_____
Judge, notary or other officer
authorized to administer oaths

_____
Official title

## USE NOTE

  1.  Unless otherwise ordered by the court, this return is not to be filed with the court prior to service of the summons and complaint on the defendant.

  2.  If service is made by the sheriff or a deputy sheriff of a New Mexico county, the signature of the sheriff or deputy sheriff need not be notarized.

[Adopted effective August 1, 1988; as amended by Supreme Court Order 05-8300-01, effective March 1, 2005; by Supreme Court Order 07-8300-16, effective August 1, 2007; by Supreme Court Order No. 12-8300-026, effective for all cases filed or pending on or after January 7, 2013.]

FILED IN MY OFFICE
DISTRICT COURT CLERK
3/13/2015 3:33:19 PM
STEPHEN T. PACHECO
Victoria Martinez

FIRST JUDICIAL DISTRICT COURT
STATE OF NEW MEXICO
COUNTY OF SANTA FE

GRASSHOPPER NATURAL MEDICINE LLC, and
BRANDON TAYLOR, individually,

        Plaintiff,

v.

                                No. D-101-CV-2015-318

THE HARTFORD CASUALTY
INSURANCE COMPANY,

        Defendant.

## FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT, INSURANCE BAD FAITH AND RELATED CAUSES OF ACTION

COME NOW, Plaintiffs, Grasshopper Natural Medicine, LLC and Brandon Taylor, by and through their attorneys, H. Jesse Jacobus, III, Law Office of George "Dave" Giddens, P.C. and for their First Amended Complaint against Defendant states:

### PARTIES AND VENUE

1.     Plaintiff, Grasshopper Natural Medicine is a duly registered LLC, doing business in Santa Fe County, State of New Mexico.

2.     Plaintiff Brandon Taylor is the owner of Grasshopper Natural Medicine, LLC ("Grasshopper").

3.     Plaintiff, individually, is also the owner of the building where Grasshopper, is located.

4.     The business relationship between Mr. Taylor individually and Grasshopper is a formal one, due to the existence of a lease agreement between Mr. Taylor and Grasshopper for the lease of the building located at 1348 Pacheco St. Suite 206, Santa Fe, New Mexico. See Exhibit A (Lease).

5.     Upon information and belief, Defendant The Hartford Casualty Insurance Company ("Hartford") is a foreign corporation, doing business in New Mexico.

6.     At this time, Plaintiff is not seeking in excess of $75,000.

7.     Venue in this Court is proper.

## FACTS APPLICABLE TO ALL COUNTS

8.     Plaintiff Grasshopper is a Natural/Holistic medical provider that specializes in providing medical services such as therapeutic massage, Oriental Medicine, acupuncture, and herbal prescriptions, to its New Mexico patients.

9.     Mr. Taylor is not a lawyer.

10.    In 2009, Grasshopper had an insurance policy through Hartford (Policy No. 65 SBA NW9053 DX).

11.    Grasshopper was the named insured for that policy.

12.    Mr. Taylor, individually, as Grasshopper's landlord with a valid lease agreement between himself and Grasshopper, should have also been covered as an insured under Grasshopper's general liability coverage.

13.    Upon information and belief, that policy included, *inter alia*, originally workers compensation insurance for Plaintiff.

2

14.     In 2009 Plaintiff, Grasshopper, advised Hartford that its mailing address had changed from 204 N. Guadalupe St. Suite C, Santa Fe NM 87501 to 1348 Pacheco St. Suite 206 Santa Fe, NM 87505.

15.     On July 15, 2009, Hartford sent Grasshopper a "POLICY CHANGE" endorsement acknowledging this new mailing address change.

16.     On July 15, 2010, Hartford sent Grasshopper a second "POLICY CHANGE" endorsement acknowledging this mailing address change.

17.     In the 2010-2011 timeframe, Grasshopper paid premiums for, *inter alia*, worker's compensation coverage as part of the policy it purchased from Hartford.

18.     Despite having twice acknowledged Grasshopper's correct mailing address, and unbeknownst to Plaintiffs, in 2011 Defendant sent Grasshopper's renewal papers for the workers' compensation coverage to the wrong address.

19.     Hartford never followed up with a phone call or letter to the correct mailing address for Plaintiffs advising of the need to renew the workers' compensation policy, prior to its lapse.

20.     Because of Hartford's negligence, Grasshopper's worker's compensation policy lapsed.

21.     As a part of the underwriting process, at all material times, Hartford had in its possession an "audit form" in which Plaintiff Grasshopper disclosed that it had more than three (3) employees.

3

22.     Plaintiff was surprised when he received the cancellation letter form Hartford so he called the insurance company and spoke with a Hartford Employee.

23.     Hartford's employee told Mr. Taylor that it was his fault the policy was cancelled because he failed to timely renew the policy, despite the fact that Hartford sent the renewal letter to the wrong address, and failed to timely send the renewal to the correct address, and failed to otherwise advise Mr. Taylor that the renewal was due.

24.     Hartford told Mr. Taylor that he could renew his workers' compensation coverage but that he could only do so at an increased charge, and that Hartford would not provide coverage, retroactively, for the "gap" in coverage it had caused due to its failure to mail the renewal to the correct address.

25.     At this time, Mr. Taylor told Hartford he was not satisfied with its position, or customer service and that it was his belief that he did not need workers' compensation coverage because Grasshopper did not have the requisite number of employees to be required to carry workers' compensation coverage under New Mexico law.

26.     Mr. Taylor's belief on this issue was incorrect. However, Defendant Hartford had in its possession an "audit form" detailing the number of employees Grasshopper had, and despite the fact that Hartford had superior knowledge to Mr. Taylor on the issue of how many employees were needed to trigger the requirement to carry workers' compensation insurance, Defendant Hartford failed to tell Mr. Taylor that he needed such coverage to be in compliance with New Mexico law.

4

27.     On December 10, 2013, Ms. Rose Gardner-Rael alleged she suffered a slip and fall accident on the Grasshopper premises.

28.     At that time, Ms. Rose Gardner-Rael was an employee of Grasshopper.

29.     During the December 10, 2013, timeframe, Grasshopper had a business liability insurance policy with Defendant Hartford, Policy No. 65 SBA ZR3068. The general business liability coverage was provided pursuant to the Business Liability Coverage form SS008 0405.

30.     Mr. Taylor and Grasshopper subsequently tendered the claim to Hartford.

31.     Hartford denied Mr. Taylor's claim on the basis that, *inter alia*, he individually was not an additional insured under the policy.

32.     Hartford denied Grasshopper's claim, *inter alia*, on the basis that it did not have workers' compensation coverage at the time of the policy, and therefore a workers' compensation exclusion on the general liability policy applied to bar coverage.

33.     The Hartford did this despite the fact that the reason Grasshopper did not have such coverage was due to the Hartford's negligence, as described above.

34.     On June 26, 2014, Rose Gardner-Rael filed a lawsuit in state court, against Grasshopper and Mr. Taylor for her alleged slip and fall accident.

35.     During at least one telephonic phone call with the Hartford regarding Ms. Rose Gardner-Rael's claims, Mr. Taylor specifically asked the Hartford not to assist the Plaintiff in anyway with regard to her claims against Mr. Taylor and/or his company Grasshopper. In other words, Mr. Taylor specifically asked the Hartford not to help Plaintiff sue him better.

36.     The Hartford's adjuster told Mr. Taylor that it would not provide assistance to Ms. Rose Rael. Subsequently, Mr. Taylor wanted to avoid a situation where he, individually, would be without coverage in the event a plaintiff sued him for an accident occurring on the Grasshopper premises.

37.     Mr. Taylor contacted the Hartford and asked whether he needed to purchase additional insurance or submit additional documents in order to become an additional insured under Grasshopper's policy with the Hartford.

38.     At that time, the Hartford's employee asked for, and Mr. Taylor provided, his lease agreement with Grasshopper to Hartford.  The Hartford's employee then told Mr. Taylor that "of course" he did not have to do anything to be covered under the existing Grasshopper policy, because as a landlord, he was automatically an additional insured.

39.     At that time, Ms. Gardner-Rael had not filed any claim or lawsuit with the New Mexico Worker's Compensation Administration related to her alleged slip and fall on Grasshopper's premises.

40.     To date, the Hartford has never defended, or indemnified Mr. Taylor against Ms. Rose Gardner-Rael's claims.

41.     To date, the Hartford has never defended or indemnified Grasshopper against Ms. Rose Rael-Gardner's claims.

42.     Prior to October 10, 2014, the Hartford never sought any declaratory judgment asking a New Mexico Court to determine whether there was coverage either for Grasshopper or Mr. Taylor.

6

43.     On October 10, 2014, Ms. Gardner-Rael filed an amended complaint in state court naming the Hartford as a party to her slip and fall lawsuit and seeking a coverage determination on the workers' compensation exclusion issue.

44.     Ms. Gardner-Rael's amended complaint did not add Mr. Taylor or Grasshopper as a party to the coverage issue.

45.     On December 1, 2014, the Hartford filed its answer and counterclaim to Ms. Gardner-Rael's Amended Complaint.

46.     The Hartford's counterclaim on this purported coverage issue was asserted solely against Ms. Rose Gardner-Rael, and did not include Plaintiffs as a party.

47.     The Hartford has attempted to obtain a coverage determination adverse to the interests of its insured, Grasshopper, and additional insured, Mr. Taylor, without naming Plaintiffs as a party to that action.

48.     At the time the Hartford filed its answer and counterclaim, it had the assistance of New Mexico counsel.

49.     Specifically, The Hartford was represented by Todd A. Schwarz, from Miller Stratvert P.A., has at all material times, and is currently representing it with regard to Plaintiff Rael's alleged slip and fall claims.

50.     New Mexico law is clear that an insurer cannot obtain an adjudication of a coverage issue without including its insured as a necessary party to that litigation. The Hartford, with its experience writing policies and adjusting claims in New Mexico and with the benefit of

its New Mexico Counsel, Mr. Schwarz, should have known that it could not assert a "counterclaim" on coverage against Ms. Gardner-Rael that did not include Plaintiffs.

51.    The Hartford's "counterclaim" against Ms. Gardner-Rael went even further than merely attempting to extinguish Ms. Rael's alleged claims.  In its Counterclaim, the Hartford expressly asserted that "Ms. Rael has the right to pursue her claims [against Grasshopper] under the New Mexico Worker's Compensation Act for her injuries."

52.    The Hartford's "counterclaim" against Ms. Gardner-Rael further asserts: "Ms. Rael can seek recovery from the New Mexico Uninsured Employers' Fund, even if her employer did not carry workers' compensation coverage."

53.    The Hartford's "counterclaim" against Ms. Gardner-Rael further asserts: "Ms. Rael's slip and fall and resulting injuries are excluded under The Policy because the injury occurred on the job, and therefore, Ms. Rael's employer, Grasshopper Natural Medicine, is liable under New Mexico worker's compensation laws."

54.    The Hartford's helpful legal advice, as articulated through its counsel Todd Schwarz, in its "counterclaim" was for Ms. Gardner-Rael to leave the Hartford alone and go file an additional lawsuit against its own insureds. This is exactly what Mr. Taylor asked The Hartford not to do, and exactly what the Hartford's employee promised it would not do.

55.    In giving Ms. Gardner-Rael helpful legal advice on how and where to sue its insureds better, the Hartford put its own interests above that of its insureds.

8

56.     On January 8, 2015, Ms. Gardner-Rael followed the Hartford's friendly and helpful legal advice and filed a second lawsuit against Grasshopper in the New Mexico Workers' Compensation Administration, adding the New Mexico Uninsured Employers' Fund as a party.

57.     NMSA 1978, § 52-1-9.1 empowers the New Mexico Uninsured Employers' Fund to penalize an employer who fails to have workers compensation insurance, and seek subrogation against an employer for any money paid to an alleged injured worker out of the Fund.

58.     On February 6, 2015, The Hartford doubled down on its prior breaches of fiduciary duty and bad faith when it filed a Motion for Summary Judgment on Plaintiff Rael's coverage claims.

59.     In that pleading, The Hartford again affirmatively stated that "Ms. Rael, therefore, has the right to pursue claims under the Workers' Compensation Act, NMSA §§ 52-1-*1, et seq."

60.     The Hartford further stated its legal opinions, which were adverse to the interests of its insured that "Clearly, physical injuries resulting from an on-the job slip and fall are compensable under the Workers' Compensation Act."

61.     The Hartford further provided a roadmap, and additional helpful legal advice, for Plaintiff Rael to pursue against its insured when it stated that "However, regardless of whether her employer purchased workers' compensation coverage, she has rights to recover under the Workers' Compensation Act if Grasshopper employers more than three workers. NMSA § 52-1-2. If Grasshopper did not purchase workers' compensation coverage, then it would not be allowed to avail itself of certain protections afforded to employers who purchases workers'

compensation coverage. NMSA § 42-1-8(C). Moreover, Ms. Rael could seek recovery under the New Mexico Uninsured Employer's Fund, if Grasshopper did not have workers' compensation coverage."

62.     By virtue of retaining Mr. Schwarz, and his firm, who are presumably competent New Mexico counsel regarding insurance bad faith, the Hartford knew it had fiduciary duties to its insured when it filed the above referenced pleadings.

63.     The Hartford also knew, by virtue of its retention of Mr. Schwarz, and his firm, that it had a duty not to put its own interests above those of its insured.

64.     By virtue of retaining Mr. Schwarz, and his firm, the Hartford's acts of giving Plaintiff Gardner-Rael helpful legal advice, as outlined above, can only be interpreted as **intentional acts**, by the Hartford to breach its fiduciary duties to Plaintiffs and place the Hartford's interests above that of its own insureds.

65.     In giving Ms. Gardner-Rael helpful and timely legal advice, the Hartford, and its New Mexico counsel, have exposed the Hartford's insureds to additional penalties, and arguably even made admissions that Ms. Gardner-Rael has a compensable workers' compensation claim.

66.     In giving Ms. Gardner-Rael helpful legal advice, the Hartford, and its New Mexico Counsel, have exposed its insureds to the potential of parallel litigation in both state court and the New Mexico Workers' Compensation Administration.

67.     In giving Ms. Gardner-Rael helpful legal advice, through its New Mexico counsel, the Hartford has acted willfully, intentionally, and in bad faith against the interests of its insureds in an all-out effort to protect its own interests.

## COUNT I: BREACH OF CONTRACT BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

68.    Plaintiff incorporates by reference all prior allegations as if set forth herein in full.

69.    The insurance policies, Policy No. 65 SBA ZR3068 and Policy No. 65 SBA NW9053 DX, were valid contracts as recognized under New Mexico law.  The forms themselves were offers, which were accepted by Plaintiffs when they filled them out and paid premiums.

70.    The contracts were also supported by good and valuable consideration.

71.    By denying Plaintiffs' claims, despite the fact that Rose Gardner-Rael's lawsuit was not filed in workers compensation, but in state court under tort theories, Defendant breached its contracts with Plaintiffs.

72.    In New Mexico, there is a duty of good faith and fair dealing written into every contract, regardless of whether it is spelled out expressly.

73.    By virtue of failing to conduct a timely and reasonable investigation into Plaintiffs' claims, failing to timely send the workers compensation renewal to Plaintiff's correct address, failing to add Mr. Taylor as an additional insured, attempting to litigate coverage issues in the absence of its insureds, and helping Ms. Rose Gardner-Rael to timely file a claim before the New Mexico Workers' Compensation Administration, Defendant breached that duty to Plaintiffs.

74.    As the proximate and direct cause of Defendant's breach of contract and breach of the duty of good faith and fair dealing, Plaintiff has been damaged in an amount to be proven at trial.

75.    Defendant's conduct was willful, wanton, or reckless such that it would be appropriate for the jury to award punitive damages in order to deter Defendant from further similar conduct in the future.

## COUNT II: INSURANCE BAD FAITH

76.    Plaintiff incorporates by reference all prior allegations as if set forth herein in full.

77.    There is implied in every insurance policy a duty on the part of the insurance company to deal fairly with the policy holder.

78.    Fair dealing means to act honestly and in good faith in the performance of the contract.

79.    The insurance company must give equal consideration to its own interests and the interests of the policy holder.

80.    An insurance company is obligated to look for insurance coverage, not to look for reasons to deny coverage.

81.    In addition, the duty to defend in New Mexico is far greater than the duty to indemnify. An insurance company has a duty to defend if the claim even arguably falls within coverage.

82.    Ms. Rose Gardner-Rael's tort allegations arguably fell within the coverage provided by Hartford for Grasshopper, Mr. Taylor, or both.

83.    An insurance company and its employees act in bad faith when they refuse to pay a claim of the policyholder for reasons which are improper or unfounded.

84.    Defendant's decision not to at least defend Plaintiffs was frivolous.

12

85.     Defendant's decision to attempt to litigate coverage in the absence of its insured was improper.

86.     In deciding whether to pay a claim, the insurance company and its employees must act reasonably under the circumstances to conduct a timely and fair investigation and evaluation of the claim.

87.     An insurer and its employees and agents may not unreasonably delay notification to the policyholder that the claim will be paid or denied.

88.     A failure to timely investigate, evaluate, and/or pay a claim is a bad faith breach of the duty to act honestly and in good faith in the performance of the insurance contract.

89.     The acts and failures to act of Defendant as enumerated above constitute a breach of their duty of good faith to Plaintiff.

90.     As a direct result of the bad faith of Defendant, Plaintiffs have suffered damages, and seek compensatory damages in a monetary amount to be determined at trial.

91.     The acts and failures to act of Defendant as enumerated above, constitute an unreasonable failure to pay a first party coverage claim, entitling Plaintiff to an award of reasonable attorney fees and costs pursuant to NMSA 1978, §39-2-1.

92.     The actions of Defendants were malicious, willful, reckless, wanton, oppressive, in bad faith and/or fraudulent, entitling Plaintiff to recover punitive damages in an amount to be determined at trial.

## COUNT III: UNFAIR INSURANCE CLAIMS PRACTICES

93.     Plaintiffs incorporate by reference all prior allegations as if set forth herein in full.

94.     The acts and failures to act of Defendants, as enumerated above, constitute unfair claims practices which are prohibited pursuant to the New Mexico Unfair Insurance Claims Practices Act, NMSA 1978, §59A-16-20.

95.     As a direct and proximate result of the unfair claims practices of Defendant, Plaintiffs have suffered damages in a monetary amount to be determined at trial.

96.     Plaintiff is also entitled to an award of attorney fees and costs under the statute.

## COUNT IV: UNFAIR TRADE PRACTICES

97.     Plaintiffs incorporate by reference all prior allegations as if set forth herein in full.

98.     The acts and failures to act by Defendant, as enumerated above, constitute unfair and deceptive trade practices and unconscionable trade practices which are illegal and prohibited pursuant to the New Mexico Unfair Trade Practices Act, NMSA 1978, §§57-12-1.

99.     As a direct result of Defendant's unfair and deceptive trade practices and unconscionable trade practices, Plaintiffs have suffered damages in a monetary amount to be determined at trial.

100.    Plaintiff is also entitled to attorney fees, statutory and treble damages for violations of the Unfair Trade Practices Act.

101.    The acts and failures to act by Defendant were malicious, willful, reckless, wanton, oppressive, in bad faith and/or fraudulent, entitling Plaintiffs to recover punitive damages in an amount to be determined at trial.

## COUNT V: BREACH OF FIDUCIARY DUTY

102.    Plaintiff incorporate by reference all prior allegations as if set forth herein in full.

14

103.   Defendant's duties to Plaintiffs were non-delegable duties, such that Defendants are liable to Plaintiffs for each and every violation of these duties, whether committed directly by Defendant or by any of its employees or agents.

104.   There is implied in every insurance policy a duty on the part of the insurance company to deal fairly with the policyholder and insureds like Plaintiffs.

105.   The relationship between Hartford and Plaintiffs was also one of trust, where Plaintiffs relied on Hartford to deal with them fairly.

106.   The relationship between Hartford and Plaintiffs was a fiduciary relationship as recognized by New Mexico law.

107.   Defendant repeatedly put its interests above its insureds with its claims handling and other treatment of Plaintiffs, including its decision to give Ms. Rose Gardner-Rael helpful legal advice on how to timely sue its own insured better and within the statute of limitations for workers' compensation claims.

108.   Defendant has given Plaintiffs inconsistent information as to whether Mr. Taylor was an additional insured under the policy.

109.   Defendant has acted negligently with regard to the renewal of Grasshopper's workers compensation coverage and then attempted to improperly blame Grasshopper for the lapse of that coverage.

110.   Defendant also breached their fiduciary duties by engaging in the above conduct and by failing to pay Plaintiff's claim, at a minimum, Defendant should have defended Plaintiffs

under a reservation of rights pending resolution of a declaratory judgment action on coverage that included Plaintiffs as parties.

111.    As a result of Defendant's breach of fiduciary duties, Plaintiffs have been injured in an amount to be proven at the time of trial.

### COUNT VI: NEGLIGENCE & PROFESSIONAL NEGLIGENCE

112.    Plaintiffs incorporate by reference all prior allegations as if set forth herein in full.

113.    Upon information and belief, Defendant planned, directed and put into operation the conduct and actions that resulted in an unjustified cancellation of Plaintiffs' workers' compensation coverage arising from the wrongful conduct described herein.

114.    Defendants also possessed superior information to Plaintiffs on when an employer should be covered under the workers' compensation statutes and should have at least advised Plaintiffs that Grasshopper needed to buy such coverage.

115.    As a result of the negligence of Defendant, Plaintiffs have suffered damages as enumerated herein.

116.    The acts and failures to act by Defendant were malicious, willful, reckless, wanton, oppressive, in bad faith and/or fraudulent, entitling Plaintiffs to recover punitive damages in an amount to be determined at trial.

117.    Because Plaintiffs have just initiated this litigation, the policy amount purchased and this lawsuit, and Ms. Rael's lawsuits are in their infancy, Plaintiffs presently value all of their claims in an amount less than $75,000 (seventy five thousand dollars).

118.   Plaintiff reserves their right to increase their valuation of their claims above the threshold jurisdictional amount for Federal Court, should the facts and circumstances as gleaned through the discovery process warrant such a re-evaluation.

**WHEREFORE,** Plaintiffs pray for judgment against Defendant for all damages as determined at trial, together with the costs of this litigation, pre-judgment and post-judgment interest, reasonable attorney's fees, punitive damages, as well as an early mediation at Defendants' expense as set forth in NMSA 1978 §57-12-1 et seq, and for such other relief as the Court may deem just and proper.

LAW OFFICE OF GEORGE "DAVE" GIDDENS, P.C.

By: */s/ H. Jesse Jacobus, III*
Electronically Filed 3.13.15
H. Jesse Jacobus, III
10400 Academy, Suite 350
Albuquerque, NM 87111
Telephone: (505) 271-1053
Facsimile: (505) 271-4848
jjacobus@giddenslaw.com
*Attorneys for Plaintiff*



EXHIBIT
A

# New Mexico Commercial Lease Agreement
## 1348 Pacheco Street, Suite 206. Santa Fe, NM 87505

This Commercial Lease Agreement ("Lease") is made and effective August 10, 2009, by and between Brandon D. Taylor ("Landlord") and Grasshopper Natural Medicine LLC dba Mountain Spirit Integrative Medicine, ("Tenant").

Landlord is the owner of premises and improvements commonly known and numbered as 1348 Pacheco Street, Suite 206 in Santa Fe, NM 87505 ("Leasd Premises"). Leased Premises are located within the Byzantium Condominium Building ("Building").

Landlord makes available for Lease "as-is", the entirety of Suite 206 within the Byzantium Condominium Building. The general common elements of the Building are available for use by Tenant as set forth in Condominium Declaration for Byzantium Condominium ("Byzantium Condominium Declarations" or "Declarations"), under official management by the Byzantium Association, a NM registered Home Owners Association ("HOA").

Landlord desires to Lease the Leased Premises to Tenant, and Tenant desires to Lease the Leased Premises from the Landlord for the Term(s), Rental Rate(s) and upon the covenants, conditions and provisions herein set forth.

THEREFORE, in consideration of the mutual promises herein, contained and other good and valuable consideration, it is agreed:

### 1. Term.
Landlord hereby Leases the Leased Premises to Tenant, and Tenant hereby Leases the same from Landlord, for an "Initial Term" of two (2) years, beginning 10 August 2009 and commencing 31 August 2011. Afterward the Lease shall automatically transfer to a "Month-to-Month Term" of Lease. Once the "Initial Term" is complete, either party may end the Month-To-Month Term of Lease via written notice at least 30 days in advance of lease termination. Landlord shall provide Tenant possession of unit for full use beginning today.

### 2. Rent.
A. Tenant shall pay to Landlord as stated below:
During "Initial Term": $3,600.00 Monthly Base Rent, beginning September 1, 2009. (First month August 2009 free rent.)
During "Month to Month Term" beginning September 1, 2011: Landlord may advise Tenant at any time after Initial Term, of new Monthly Rent. Landlord promises not to increase Monthly Rent by more than 25% over Base Rent, for at least the first 3 years upon entering Month-To-Month Term. Should lease continue beyond 5 year term, Landlord will notify tenant at least 30 days in advance of any further increases to Month to Month Term's Monthly Rental Rate.

Each installment payment shall be due in advance on the first day of each calendar month during the lease term (Beginning September 1, 2009) to Landlord via check payable to Spaces for Wellness LLC; or in such other place or means designated by notice from Landlord to Tenant. The rental payment amount for any partial calendar months included in the Lease term shall be prorated on a daily basis.

B. No "Security Deposit" is due under this Lease.


Landlord Initials

-1-

DBT
Tenant Initials

### 3. Use.

The Leased Premises are to be used for the operation of a health care office and related services to include acupuncture, massage, body work and healing etc, and for no other unrelated purpose, without the prior written consent of Landlord. Tenant will at no time exceed occupancy limit. Tenant will not commit any waste upon the Leased Premises, or create any nuisance or take any act, which may disturb the quiet enjoyment of the Building. Notwithstanding the foregoing, Tenant shall not use the Leased Premises for the purposes of storing, manufacturing or selling any explosives, flammables, or other inherently dangerous substances, chemical, thing or device.

### 4. Sublease and Assignment.

Tenant shall have the right without Landlord's consent, to assign this Lease to a corporation with which Tenant may merge or consolidate, to any subsidiary or dba of Tenant, to any corporation under common control with Tenant, or to a purchaser of substantially all of Tenant's assets. Except as set forth above, Tenant shall not sublease all or any part of the Leased Premises, or assign this Lease in whole or in part without Landlord's consent, such consent not to be unreasonably withheld or delayed.

### 5. Repairs.

During the Lease Term(s), Tenant shall make, at Tenant's expense, all necessary repairs to the interior of Leased Premises. Repairs shall include such items as routine repairs of the surface of floors, walls, ceilings, and other parts of the Leased Premises damaged or worn beyond normal occupancy. If Tenant causes malfunction of the sewer system, Tenant shall be responsible for the cost of repair to the system.

### 6. Alterations and Improvements.

Tenant, at Tenant's expense, shall have the right with Landlord's consent, to remodel, redecorate, and make additions, improvements and replacements of and to all or any part of the Leased Premises from time to time as Tenant may deem desirable, provided the same are made in a workmanlike manner and utilizing good quality materials. Tenant shall have the right to place and install personal property, trade fixtures, equipment and other temporary installations in and upon the Leased Premises, and fasten the same to the premises. All personal property, equipment, machinery, trade fixtures and temporary installations, whether acquired by Tenant at the commencement of the Lease term or placed or installed on the Leased Premises by Tenant thereafter, shall remain Tenant's property free and clear of any claim by Landlord. Tenant shall have the right to remove the same at any time during the term of this Lease provided that all damage to the Leased Premises caused by such removal shall be repaired by Tenant at Tenant's expense.

### 7. Property Taxes and Homeowners Association Fees.

Landlord shall pay property taxes and HOA fees on behalf of Leased Premises, included within the cost of Tenant's Monthly Rental Rate(s) as detailed in Section 2 above.

### 8. Insurance.

A. If the Leased Premises or any other part of the Building is damaged by fire or other casualty resulting from any act or negligence of Tenant or any of Tenant's agents, employees or invitees, rent shall not be diminished or abated while such damages are under repair, and Tenant shall be responsible for the costs of repair not covered by insurance.

B. Tenant shall be responsible, at its own expense, for fire and extended coverage insurance on all of its personal property, including removable trade fixtures, located in the Leased Premises.


Landlord Initials

- 2 -


Tenant Initials

C.   In addition to the above coverage, Tenant shall, at its own expense, maintain a policy or policies of comprehensive general liability insurance with respect to their respective activities in the Building or Common Areas with the premiums thereon fully paid on or before due date, issued by and binding upon an insurance company approved by the Landlord, such insurance to afford minimum protection of not less than $2,000,000.00 general aggregate coverage of liability and property damage.  Landlord shall not be required to maintain insurance against thefts within the Leased Premises or the Building.

### 9. Utilities.
Tenant shall pay all charges for water, sewer, gas, electricity, telephone and other services and utilities used by Tenant on the Leased Premises during the term of this Lease unless otherwise expressly agreed in writing by Landlord with thirty (30) days notice given to Tenant.

### 10. Signs.
With Landlord's prior consent, Tenant shall have the right to place a sign or sign(s) on the Leased Premises, in compliance with Byzantium Condominium Declarations requirements; and so long as such signs are permitted by applicable zoning ordinances and private restrictions.  Landlord may refuse consent to any proposed signage that is in Landlord's opinion too large, deceptive, unattractive or otherwise inconsistent with or inappropriate to the Leased Premises or use of any other tenant.  Landlord shall assist and cooperate with Tenant in obtaining any necessary permission from governmental authorities or adjoining owners and occupants for Tenant to place or construct foregoing signs.  Tenant shall repair all damage to the Leased Premises resulting from the removal of signs installed by Tenant.

### 11. Entry.
Landlord shall have the right to enter upon the Leased Premises at reasonable hours to inspect the same, provided Landlord shall not thereby unreasonably interfere with Tenant's business on the Leased Premises.

### 12. Common Areas.
A. Parking: During the Term(s) of this Lease, Tenant shall have the use of Parking as described by the HOA in the Byzantium Condominium Declarations.  Tenant shall have no right to subleasing.

B.  Other Common Areas:  The roof garden, hallways, stairwells, elevator, entry, parking lot, and all other areas situated on or in the Property which are designated Common Elements by the HOA, may be used by Tenant and all of Tenant's guest, in accordance with the Byzantium Condominium Declarations.  Tenant is responsible to keep clean and maintain any Common Areas used for any purpose.

### 13. Building Rules.
Tenant will comply with the rules of the Building adopted by the HOA Byzantium Association, and will cause all of its agents, employees, invitees, guests and visitors to do so as well.

### 14. Damage and Destruction.
Subject to Section 8 above, if the Leased Premises or any part thereof or any appurtenance thereto is so damaged by fire, casualty or structural defects that the same cannot be used for Tenant's purposes, then Tenant shall have the right within ninety (90) days following damage to elect by notice to Landlord to terminate this Lease as of the date of such damage.  In the event of minor damage to any part of the Leased Premises, and if such damage does not render the Leased Premises unusable for Tenant's purposes, Landlord shall promptly repair such damage at the cost


Landlord Initials

- 3 -


Tenant Initials

of the Landlord. In making the repairs called for in this paragraph, Landlord shall not be liable for any delays resulting from strikes, governmental restrictions, inability to obtain necessary materials or labor or other matters which are beyond the reasonable control of Landlord. Tenant shall be relieved from paying rent and other charges during any portion of the Lease term that the Leased Premises are inoperable or unfit for occupancy, or use, in whole or in part, for Tenant's purposes. Rentals and other charges paid in advance for any such periods shall be credited on the next ensuing payments, if any, but if no further payments are to be made, any such advance payments shall be refunded to Tenant. The provisions of this paragraph extend not only to the matters aforesaid, but also to any occurrence which is beyond Tenant's reasonable control and which renders the Leased Premises, or any appurtenance thereto, inoperable or unfit for occupancy or use, in whole or in part, for Tenant's purposes.

### 15. Default.

If default shall at any time be made by Tenant in the payment of rent when due to Landlord as herein provided, and if said default shall continue for fifteen (15) days after written notice thereof shall have been given to Tenant by Landlord, or if default shall be made in any of the other covenants or conditions to be kept, observed and performed by Tenant, and such default shall continue for thirty (30) days after notice thereof in writing to Tenant by Landlord without correction thereof then having been commenced and thereafter diligently prosecuted, Landlord may declare the term of this Lease ended and terminated by giving Tenant written notice of such intention, and if possession of the Leased Premises is not surrendered, Landlord may reenter said premises. Landlord shall have, in addition to the remedy above provided, any other right or remedy available to Landlord on account of any Tenant default, either in law or equity. Landlord shall use reasonable efforts to mitigate its damages.

### 16. Quiet Possession.

Landlord covenants and warrants that upon performance by Tenant of its obligations hereunder, Landlord will keep and maintain Tenant in exclusive, quiet, peaceable and undisturbed and uninterrupted possession of the Leased Premises during the term of this Lease.

### 17. Condemnation.

If any legally constituted authority condemns the Building or such part thereof which shall make the Leased Premises unsuitable for leasing, this Lease shall cease when the public authority takes possession, and Landlord and Tenant shall account for rental as of that date. Such termination shall be without prejudice to the rights of either party to recover compensation from the condemning authority for any loss or damage cause by the condemnation. Neither party shall have any rights in or to any aware made to the other by the condemning authority.

### 18. Subordination.

Tenant accepts this Lease subject and subordinate to any mortgage, deed or trust or other lien presently existing or hereafter arising upon the Leased Premises, or upon the Building and to any renewals, refinancing and extensions thereof, but Tenant agrees that any such mortgagee shall have the right at any time to subordinate such mortgage, deed or trust or other lien to this Lease on such terms and subject to such conditions as such mortgagee may deem appropriate in its discretion. Landlord is hereby irrevocably vested with full power and authority to subordinate this Lease to any mortgage, deed of trust or other lien now existing or hereafter placed upon the Leased Premises of the Building, and Tenant agrees upon demand to execute such further instruments subordinating this Lease or attorning to the holder of any such liens as Landlord may request. In the event that Tenant should fail to execute any instrument of subordination herein required to be executed by Tenant promptly as requested, Tenant hereby irrevocably constitutes Landlord as its attorney-in-fact to execute such instrument in Tenant's name, place and stead, it being agreed that such power is on coupled with an interest. Tenant agrees that it will from time to time upon request by Landlord execute and deliver to such persons as Landlord shall request a statement in recordable


Landlord Initials

- 4 -


Tenant Initials

form certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force as so modified), stating the dates to which rent and other charges payable under this Lease have been paid, stating that Landlord is not in default hereunder (or if Tenant alleges a default stating the nature of such alleged default) and further stating such other matters as Landlord shall reasonably require.

### 19. Notice.
Any notice required or permitted under this Lease shall be deemed sufficiently given or served if sent by United States certified mail, return receipt requested, addressed as follows:

If to Landlord to Brandon Taylor, 1279 Senda del Valle, Santa Fe, NM 87507.
If to Tenant to Grasshopper Natural Medicine LLC, 1348 Pacheco Street, Suite 206, Santa Fe, NM 87505.

Landlord and Tenant shall each have the right to from time to time to change the place notice is to be given under this paragraph by written notice thereof to the other party.

### 20. Brokers.
Tenant represents that Tenant was not shown the Premises by any real estate broker or agent and that Tenant has not otherwise engaged in, any activity which could form the basis for a claim for real estate commission, brokerage fee, finder's fee or other similar charge, in connection with this Lease.

### 21. Waiver.
No waiver of any default of Landlord or Tenant hereunder shall be implied from any omission to take any action on account of such default if such default persists or is repeated, and no express waiver shall affect any default other than the default specified in the express waiver and that only for the time and to the extent therein stated. One or more waivers by Landlord or Tenant shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition.

### 22. Memorandum of Lease.
The parties hereto contemplate that this Lease should not and shall not be filed for record, but in lieu thereof, at the request of either party, Landlord and Tenant shall execute a Memorandum of Lease to be recorded for the purpose of giving record notice of the appropriate provisions of this Lease.

### 23. Headings.
The headings used in this Lease are for convenience of the parties only and shall not be considered in interpreting the meaning of any provision of this Lease.

### 24. Successors.
The provisions of this Lease shall extend to and be binding upon Landlord and Tenant and their respective legal representatives, successors and assigns.

### 25. Consent.
Landlord shall not unreasonably withhold or delay its consent with respect to any matter for which Landlord's consent is required or desirable under this Lease.

### 26. Performance.


Landlord Initials

- 5 -

D BT
Tenant Initials

If there is a default with respect to any of Landlord's covenants, warranties or representations under this Lease, and if the default continues more than fifteen (15) days after notice in writing from Tenant to Landlord specifying the default, Tenant may, at its option and without affecting any other remedy hereunder, cure such default and deduct the cost thereof from the next accruing installment or installments of rent payable hereunder until Tenant shall have been fully reimbursed for such expenditures, together with interest thereon at a rate equal to the lessor of twelve percent (12%) per annum or the then highest lawful rate. If this Lease terminates prior to Tenant's receiving full reimbursement, Landlord shall pay the un-reimbursed balance plus accrued interest to Tenant on demand.

**27. Compliance with Law.**
Tenant shall comply with all laws, orders, ordinances, and other public requirements now or hereafter pertaining to Tenant's use of the Leased Premises. Landlord shall comply with all laws, orders, ordinances and other public requirements now or hereafter affecting the Leased Premises.

**28. Final Agreement.**
This Agreement terminates and supersedes all prior understandings or agreements on the subject matter hereof. This Agreement may be modified only by a further writing that is duly exceeded by both parties.

**29. Governing Law.**
This Agreement shall be governed, construed and interpreted by, through and under the Laws of the State of New Mexico.

**30. Holding Over.**
Tenant shall vacate the Property upon the expiration or earlier termination of this Lease. Tenant shall reimburse Landlord and indemnify Landlord against all damages incurred by Landlord from any delay by Tenant in vacating the property which damages are not caused by Landlord. Tenant's occupancy of the Property after the Initial Term shall be the Month-to-Month Term as described in Section 1, subject to all terms of the Lease. Tenant shall notify Landlord thirty days prior to moving out during any holdover following the Lease Term.

**31. Indemnity.**
A. Tenant shall save Landlord harmless, defend, and indemnify Landlord from all injury, loss, claims, or damage to any person or property while on the Leased Premises and/or the Building within which the Leased Premises are located, including costs and reasonable attorneys' fees, caused by the acts, negligence, willful misconduct, or default of Tenant, its employees, agents, licensees, or contractors (but excluding that portion caused by the negligence or willful misconduct of Landlord, its agents, licensees, employees, or contractors).

B. To the extent, if at all, Section 56-7-1 NMSA 1978 (1971) is applicable to any indemnification set forth in this Lease, this indemnification will not extend to liability, claims, damages, losses or expenses the indemnification for which is prohibited by Section 56-7-1.

**32. Condition Upon Termination.**
Upon the termination of the Lease, Tenant shall surrender the Property to Landlord, broom-cleaned and in the same condition as received at commencement of the Lease, except for ordinary wear and tear which Tenant was not otherwise obligated to remedy under any provision of this Lease. Landlord may require Tenant to remove any alterations, additions or improvements (whether or not made with Landlord's consent) prior to the termination of the Lease and to restore the Property to its prior condition, all at Tenant's expense. All alterations, additions, and improvements which Landlord has not required Tenant to remove shall become Landlord's property and shall be


Landlord Initials

- 6 -


Tenant Initials

surrendered to Landlord upon the termination of the Lease, except that Tenant may remove any of Tenant's machinery or equipment which can be removed without material damage to the Property. Tenant shall repair, at Tenant's expense, any damage to the Property cause by the removal of any such machinery or equipment.

In the event that Tenant abandons any of its property, Landlord may either retain the property or dispose of it at Tenant's expense and without accountability in whatever manner Landlord may see fit. If Landlord causes the property to be removed, any damage caused by the removal and any other damage to the Property caused by Tenant's removal may be repaired at Tenant's expense and Tenant shall pay to Landlord upon demand all such expenses. The above provisions shall survive the expiration or termination of this Lease.

### 33. Arbitration of Disputes Between Landlord and Tenant.

Any existing or future controversy between Landlord and Tenant of whatsoever kind shall be submitted to binding arbitration pursuant to the New Mexico Uniform Arbitration Act, Section 44-7-A-1, et seq., NMSA 1978. The venue for that arbitration shall be in the County of Santa Fe, State of New Mexico. As to any claim, the parties shall first use their best efforts to agree upon an arbitrator acceptable to both. If the parties are unable to agree upon a mutually acceptable arbitrator within thirty (30) days from the date of the original written claim in arbitration, then with all reasonable dispatch each party shall appoint one arbitrator and those arbitrators shall appoint another arbitrator. All arbitrators shall then hear the arbitration as soon as practicable. If the controversy is heard by one (1) arbitrator, then the expense of that arbitrator shall be paid equally by each side. If more than one arbitrator hears the matter, then the losing party as determined by the arbitrators shall bear all expense of the arbitrators. The nonprevailing party shall pay the attorneys' fees, costs and expenses of the prevailing party, except the cost of the arbitrators described above.

### 34. Personal Guarantee.

By executing this Commercial Lease Agreement, Landlord and Tenant has personally and individually guaranteed timely performance of all obligations under this Lease.

IN WITNESS WHEREOF, the parties have executed this Lease as of the day and year first above written.

_____
Landlord, Brandon D. Taylor

_____
Tenant, Grasshopper Natural Medicine LLC dba Mountain Spirit Integrative Medicine
Representative: Dr. Brandon Taylor, DOM


Landlord Initials

- 7 -

Tenant Initials